# HOLGATE & Another *v.* EATON.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF OHIO.

Argued November 24, 25, 1885.—Decided December 14, 1885.

A married woman who, on being informed of a contract made by her husband for the sale of an equitable interest in real estate held by her in her own right, repudiates it, and who, for more than two years, refuses to perform it whenever thereto requested, during which time the property depreciates greatly in value, cannot, after the expiration of that time, enforce in equity the specific performance of the contract by the other party.

When the husband of a married woman obtains a decree of foreclosure of a mortgage held by him as her trustee, and at the sale purchases the property and takes a deed in his own name. she retains an equitable interest therein, as against a purchaser from the husband with actual notice.

A loaned B a sum of money on a conveyance of a tract of land, the equitable interest in which belonged, as A knew at the time, to B's wife. He further agreed with B to acquire an outstanding tax title of the property, and subsequently complied with that agreement. Simultaneously by a separate instrument, they agreed that A, on payment of a further sum, might, at his election, acquire the whole title of B and wife, to be conveyed by warranty deed executed by both ; or, if A so elected, B should repay the sum loaned and the amount paid for the tax-title, A holding the premises as

security until such payments, and then reconveying. B's wife, though often requested, refused to comply with the agreement. After the lapse of more than two years, the property meanwhile having greatly depreciated, B's wife, by next friend, filed a bill in equity against A to compel specific performance. A filed a cross-bill against B and wife in that suit to recover the sum loaned and the sum paid for the tax-title. The wife dying, the suit was revived and prosecuted by her administrator ; and her heirs also joined as complainants. *Held*, (1) That the delay in commencing proceedings was inexcusable, especially as a material change took place meanwhile in the subject-matter of the contract. (2) That the estate of the wife was not charged with the payment of the debt. (3) That without further facts not before it this court could not say what effect the outstanding tax-title in the hands of A had upon the wife's estate. (4) That the title or interest of B in the land was charged with payment of the sum loaned and of the sum paid for the tax-title (5) That the offers in the cross-bill entitled the heirs to conveyances of B's interest and of the tax-title on payment of both sums with interest, if they desired it. (6) That, they declining, A was entitled to a personal decree against B, and the cross-bill could be dismissed as to the heirs, without prejudice to A.

In equity. The facts which make the case are stated in the opinion of the court.

*Mr. Henry Newbegin* in person, and *Mr. William C. Holgate* in person, for appellants.

*Mr. James H. Hoyt* [*Mr. H. S. Sherman* was with him on the brief] for appellee.

Mr. JUSTICE MILLER delivered the opinion of the court.

This is an appeal from the Circuit Court for the Northern District of Ohio.

The suit was originally brought by a bill in equity, in the name of Elizabeth R. Eaton, by her next friend, Rufus J. Eaton. During its progress Mrs. Eaton died, and her next friend was appointed administrator of her estate, and it was revived by him in that character. Afterwards her heirs were made plaintiffs also.

The case as it was presented to the Circuit Court for final decree, and as it comes before us, is to be gathered from the pleadings, documentary evidence, written correspondence, and depositions which are voluminous. We shall not recapitulate

the evidence, but state the material facts as we believe them to be established.

John B. Eaton, the husband of the complainant, who resided with her in Maine, and who claimed to be the owner in his own right of ninety-five acres of land near the town of Defiance, in the State of Ohio, lying between the Wabash and Erie Canal and the Pittsburgh and Fort Wayne Railroad, was in July, 1874, at Defiance trying to sell it. Being in pressing want of money, he made his note for $400, payable to the Defiance National Bank in ninety days, dated July 30, 1874, with Holgate and Newbegin, who are appellants here, as his sureties. This note they afterwards paid.

On the same day Eaton made a conveyance, absolute on its face, to Holgate of the land above mentioned, and, at the same time, he and Holgate executed the following agreement:

"DEFIANCE, OHIO, *July* 30*th*, 1874.

"This memorandum witnesseth, that John B. Eaton, of Fryeburg, Maine, has this day sold to Wm. C. Holgate, 'that part of the east half of section twenty-seven (27), T. 4 N., R. 4 E., lying between the Fort Wayne road and the W. & E. Canal, and containing 95 acres, more or less, excepting $12\frac{75}{100}$ acres now held by Michael Gorman, all more fully described and set forth in a deed this day executed by said John B. Eaton to said Holgate. It is understood said Holgate is to pay for said land the sum of six thousand dollars, and any valid tax claim Adam Wilhelm may hold on said premises, one thousand dollars of which is to be paid on or before October 1st next; two thousand dollars in six months thereafter; fifteen hundred dollars ($1500.00) in one year thereafter, and fifteen hundred dollars in two years thereafter, with interest from and after October first. It is further understood said Eaton is to execute another deed of warranty, his wife being joined with him as grantor in same, and to forward said deed on to H. Newbegin for said Holgate, which is to be substituted for the deed this day executed to said Holgate as aforesaid. And said Eaton agrees to send on to said Newbegin the mortgage and notes on which the judgment was taken by which his title was ac-

quired, in case he can find same, which are to be filed according to law. It is further understood and agreed that if, on or before said October first, from any cause, said Holgate shall prefer not to hold said premises on the terms herein set forth, said Eaton agrees to repurchase same of him, and to release any instalment that is unpaid of said Holgate, or portion of same, and the obligation to pay said Wilhelm's tax claims; also to refund with interest four hundred dollars ($400.00) this day advanced on said $1000.00 instalment to come due October first next, and for any advancements to said Eaton by said Holgate that is or may be made, said Holgate shall have a lien on said premises, and may hold the title for same as security till such advancements shall be adjusted. If, however, said Holgate shall be satisfied with said purchase on account of quality of land and all other particulars, he shall, at any time after sixty days, on demand of said Eaton, execute and deliver his notes for any unpaid part of said instalments, secured by mortgage on the premises. It being understood that any amount the railway companies may pay over for the portion of said premises between the two railways shall be credited on the said $6000.00 to be paid by said Holgate, or to go to said Eaton, less advancements aforesaid, if said Holgate shall prefer to release and reconvey his interest in the premises aforesaid. Given under our hands and seals the day and year above written.

J. B. EATON. [SEAL.]

WM. C. HOLGATE. [SEAL.]

"Attest: HENRY NEWBEGIN."

Holgate immediately assigned to Newbegin an undivided half interest in this contract, of which Eaton had due notice. He also, within the time limited, notified Eaton of his election to hold the property, and required him to furnish the deed in which Mrs. Eaton was to join, and the mortgage and notes on which the foreclosure proceeding was had, and on which Eaton's title depended.

This deed, however, was not tendered to appellants until December 7, 1876, though the notice and request for it was re-

ceived before October 1, 1874. As appellants rely upon this delay as a defence to the suit for the purchase-money, it is necessary to consider its importance in the contract and the excuses offered for the delay.

It appears sufficiently, we think, on the final hearing, that Mr. Eaton had no other interest in the land at the time he executed this agreement and made his deed to Holgate than that of trustee for his wife. "The mortgage and notes on which judgment was taken, by which his title was acquired," were never produced until the hearing before the master in 1882, and the effect of them as evidence is thus stated by the master:

"It appears that, by the will of William A. Allen, brother of Elizabeth R. Eaton, a share of his estate was given to her. Bartley Campbell, of Cincinnati, her agent, seems to have had possession of this share of the estate, being personal property, and used it as his own. In accounting for the same, he assigned a mortgage which he held on lands in Defiance to John B. Eaton, her husband, in trust for Mrs. Eaton and her children. This mortgage was foreclosed under proceedings at Defiance, in which John B. Eaton appeared to be the only party in interest, and at the sheriff's sale he became the purchaser, and the sheriff's deed was made to him, of about ninety-five acres of land in Defiance."

It should be added that the assignment of this mortgage expressed on its face that it was for the benefit of Mrs. Eaton.

It is said by the master that the deed from Mrs. Eaton required by the contract was unnecessary, because by the sale and purchase under the foreclosure proceedings Eaton had acquired title, and his deed to Holgate was sufficient to convey that title discharged of all equitable rights of Mrs. Eaton.

But we are of opinion that in this the master was in error.

It is quite clear to us that Holgate had full notice of Mrs. Eaton's interest in the land, for he seems to have been aware of the nature of the assignment by Campbell of the notes and mortgage to Eaton, and therefore required that they be delivered up to him, if they could be found, and they were found.

But, as a still further security against Mrs. Eaton's equitable

right or interest in the lands, he took from Eaton the covenant that if he elected to hold the land as a purchaser, Mrs. Eaton should ·join with him as grantor in an another deed, with warranty of title. It is idle to say that Holgate did not have a pretty clear idea of Mrs. Eaton's rights in the land, and intended to have full protection against them, and that this part of the covenant had reference to a right of dower. She was to join *as grantor* in the *warranty* of title.

That all the parties understood that Mrs. Eaton had the paramount interest and equitable title to the land is seen in the whole subsequent correspondence.

It is argued on the part of the appellants, on the other hand, that the deed of Eaton and the accompanying contract constituted a mortgage for the security of Holgate in regard to the $400 note which he agreed to pay, and for the sum he might have to advance to buy in the tax title of Wilhelm, with the option, on the part of Holgate, to convert it into a purchase before October 1, that is, within sixty days. We do not deem it important to decide whether we call the transaction a mortgage or a conditional purchase. The effect is the same either way, as, if the purchase was perfected, the $400 was to be part of the purchase-money. If it was not perfected, it, with the amount paid for the tax-title, was to be a lien on the land conveyed.

It seems that when Mrs. Eaton was informed of the transaction between her husband and Holgate she refused to abide by it, and would not make the deed which the contract called for.

In August, Holgate had informed Eaton of his election to hold the land, and in a letter of September 30 he requests him to forward the deed in which his wife was to join. It is quite apparent that Mrs. Eaton had got possession or control of the notes and mortgage, which Mr. Eaton was therefore unable to surrender, and he had to confess his inability to get Mrs. Eaton to join him in the deed. About this time the railroad company by judicial proceedings, condemned and appropriated thirteen acres of the land for their use, and the sum of $2600 awarded as damages was matter of contention between Mrs. Eaton and her husband.

Under these circumstances, Holgate and Newbegin entered into correspondence with Mrs. Eaton and her son, who acted for her in the matter. They both denied the binding force of the transaction with Mr. Eaton on Mrs. Eaton.

This correspondence ran through two years, in all of which Holgate and Newbegin urged her to fulfil the contract by making a conveyance of the land, and Mr. Eaton seems to have dropped out of the matter in utter helplessness. Holgate insisted that the price of the land condemned by the railroad company should be deducted from the price he had agreed to pay, and still pressed for his deed. Finally, in June, 1875, Holgate sent to Mrs. Eaton a mortgage executed by him and Newbegin on the land, less the thirteen acres taken by the railroad company, with two notes for $1500 each, payable directly to her, not negotiable, and requested her to send the deed of herself and Mr. Eaton for the land described in the mortgage, but she declined to do so, though she kept the notes and mortgage.

On the 7th December, 1876, she did, however, tender such a deed, which, Holgate and Newbegin refused to receive, and demanded payment of the $400 they had paid the bank on the note for Mr. Eaton and the sum they had paid Wilhelm for his tax-title, $424.00. Shortly after this the present suit was commenced.

We think that the correspondence shows that during all this time until a few months before Mrs. Eaton sent her conveyance, the appellants showed themselves ready, willing, and eager to perform the contract; that Mr. Eaton, with whom they had contracted, proved himself unable to perform his covenant to procure his wife's conveyance, and that she, when appealed to and offered the consideration which the contract provided for, repudiated the husband's action in the matter, and held the notes and mortgage of the appellants for eighteen months, refusing to make the deed, without which she had no right to hold them a day.

This deed was essential to the contract. Without it Holgate would get nothing for the money he had paid and the notes he had tendered. He had a right to prompt action on the part of

Mrs. Eaton if she intended to accept the contract. We are bound to hold that while she had a right to refuse to be bound by the contract, she could not play fast and loose with the other parties to suit her pleasure. When, a year and a half after the notes and mortgages were sent to her, she tendered her deed it was too late to bind the appellants without their consent.

An important consideration leading to the same conclusion is, that at the time the contract was made, and for a year or more after, the value of the property continued to increase, but, for reasons not necessary to discuss, it had decreased so largely that at the time she tendered her deed it was worth far less than when Holgate elected to keep the land as a purchaser and demanded of Eaton the joint deed of himself and Mrs. Eaton. It is reasonable to suppose that this depreciation in value entered into the motives which finally induced her change of mind in the matter. The injustice of permitting her to delay two years her consent under these circumstances is obvious.

The case before us is practically a bill by Mrs. Eaton for specific performance. At law she could sustain no action on the notes, and the circumstances under which she received and held them and the mortgage would be a perfect defence to a mere foreclosure of the mortgage. Her only ground of success in the present suit, therefore, is in the principles of equity jurisprudence in enforcing a specific performance of the agreement to buy the land and pay the purchase-money, and the allowance which a court of chancery sometimes makes for delay when time is not of the essence of the contract.

In the case of *Taylor* v. *Longworth,* 14 Pet. 172, 174, Mr. Justice Story uses language which has since become a legal maxim in this class of cases. " In the first place (he says), there is no doubt that time may be of the essence of a contract for the sale of property. It may be made so by the express stipulation of the parties, or it may arise by implication from the very nature of the property, or the avowed objects of the seller or purchaser. And even when time is not, thus, either expressly or impliedly, of the essence of the contract, if the party seeking a specific performance has been guilty of gross

*laches*, or has been inexcusably negligent in performing the contract on his part; or if there has, in the intermediate period been a material change of circumstances, affecting the rights, interests, or obligation of the parties; in all such cases courts of equity will refuse to decree any specific performance, upon the plain ground that it would be inequitable and unjust."

It is quite apparent, therefore, that, if Mrs. Eaton is seeking to enforce the contract made with her husband, she has been grossly negligent, until altered circumstances have lost her the right to do so; and, if she relies on a contract with herself, no such contract was ever completed.

Her bill, therefore, should have been dismissed.

Holgate and Newbegin, however, filed a cross-bill against Mr. and Mrs. Eaton asserting a right to recover the $400 paid for Eaton, and the $424 paid for the deed of Wilhelm for his tax-title, and, Mrs. Eaton having died while these suits were pending, her executor and her children were made parties in both bills. This cross-bill presents more difficulty to our minds than the main bill, for it seeks to subject the land to the payment of these sums, with interest. Undoubtedly, if Mrs. Eaton had accepted the contract made by her husband she would have been bound by this part of it as well as the other, and, failing to perform her part of it, these sums would become a lien on the land, according to the agreement. But she never became bound by that contract. As we have just said, no contract was ever made between her and Holgate. They never were bound to each other at any time. There was never a common consent of minds on the subject.

We have also expressed the opinion that Eaton's deed to Holgate did not convey her equitable interest, nor did his contract bind her in the agreement. It did not bind her to join him in a conveyance, and it did not bind her land as security for the money advanced to her husband. The same consideration applies to the purchase of the Wilhelm tax-title. We cannot see how the equitable estate of Mrs. Eaton in her lifetime, or of her heirs, now that she is dead, can be made liable for a contract to which she was no party and which she never sanctioned. But appellants have such title or interest in the land

as Mr. Eaton had, and which passed by his conveyance. This may be a life estate. It may be a right to hold as a lien for costs and expenses, or it may be the naked legal title. Whatever it is it passed to Holgate by the deed.

As regards the Wilhelm tax-title, it may be a perfect title, or it may be a lien for the taxes paid by the purchaser at the tax sale. Or it may be that Holgate, holding the legal title, as Eaton did, in trust, was bound to protect that title by the purchase from Wilhelm, and if so, it may be a lien on the land, though not a perfect title.

Of all this we are unadvised. But in the cross-bill Holgate and Newbegin tender a conveyance of both these rights upon payment of the two sums mentioned, with interest. If the heirs of Mrs. Eaton will pay these sums and accept the conveyance, they should be permitted to do so. If they decline, the plaintiffs in the cross-bill may be entitled to a decree against Mr. Eaton *in personam*, for he is a defendant to that bill, has appeared, but made no answer. As regards the cross-bill against the heirs of Mrs. Eaton, if they will not pay these sums, the appellants can dismiss their bill as to them without prejudice to the legal rights of Holgate and Newbegin under the deeds from Eaton and Wilhelm, or they can proceed in it according to the principles of equity.

*The decree of the Circuit Court in the original bill is, therefore, reversed, and the decree in the cross-bill also. The case is remanded to the Circuit Court, with instruction to dismiss the original bill at the costs of the plaintiffs in that bill, and to take such further proceedings in the cross-bill as are not inconsistent with this opinion, and as may be appropriate to enforce the rights of plaintiffs therein.*